UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | |
|---|---|
| KEVIN J. GRILLO, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| TEMPUR-PEDIC INTERNATIONAL, INC., et al., | ) ) ) |
| Defendants. | ) ) |

Civil Action No. 5:05-410-JMH

**MEMORANDUM OPINION AND ORDER**

**       **       **       **       **

This matter is before the Court on the Defendants', TA Associates, Inc., Friedman, Fleischer & Lowe ("FF&L"), LLC, Tempur-Pedic International, Inc. ("Tempur-Pedic"), and Individual Defendants' Motions to Dismiss [Record Nos. 72, 73, 75, respectively]. Fully briefed, Defendants' motions are ripe for review.

**INTRODUCTION**

Plaintiffs bring this action on behalf of a putative class of all persons or entities who purchased or acquired the publicly traded securities of Tempur-Pedic, between April 22, 2005, and September 19, 2005 (the "Class Period"). Tempur-Pedic engages in the manufacture, marketing, and distribution of advanced visco-elastic products under the TEMPUR and Tempur-Pedic brands.

Plaintiffs filed suit alleging a fraudulent scheme whereby

Defendants made false and misleading statements regarding Tempur-Pedic's earnings, growth, and retail business strength. Plaintiffs also claim that Defendants omitted information regarding Tempur-Pedic's competitive pressures. Plaintiffs contend analysts' reports regarding Tempur-Pedic's earnings prospects and its ability to continue to increase earnings per share are imputable to Tempur-Pedic.[1] Plaintiffs allege that the scheme was initiated in order to drive the price of Tempur-Pedic stock to its highest price ever. Plaintiffs claim that as a result of the Defendants' conduct, Tempur-Pedic stock traded at artificially inflated levels during the Class Period, enabling Tempur-Pedic's insiders and entities associated with insiders to sell more than $246 million worth of stock at an inflated price.

The parties have extensively briefed the matter and the Court has reviewed the pleadings, motions, opposition and reply thereto. Plaintiffs bring suit alleging violations of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5, promulgated thereunder, and as well as violations of Sections 20(a) and 20A of the Exchange Act. Defendants have moved to dismiss the First Amended Complaint on a number of grounds including, but not limited to: (1) Plaintiffs fail to plead specific facts giving rise to a

---

[1] Large sections of Plaintiffs' Complaint are devoted to quoting at length from these documents. The Court will not reproduce all of these quotes, but will highlight relevant portions as necessary throughout the opinion.

strong inference of scienter; (2) the alleged misrepresentations and omissions are not pled with the particularity required by the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b); (3) the statements are immune from liability under the PSLRA's Safe Harbor Provision; and (4) the remainder of Tempur-Pedic's disclosures are not actionable.  For the reasons that follow, the Court grants Defendants' motions and finds that Plaintiffs' Complaint does not plead scienter as required by the PSLRA. Furthermore, without any primary liability, Plaintiffs cannot state a claim under Sections 20(a) and 20A for control person liability or insider trading.

## BACKGROUND

For purposes of consideration of Defendants' motions, the Court must assume the truth of the following facts, which were drawn from the Amended Complaint filed on December 7, 2006.

### I. The Parties

#### A. The Lead Plaintiff

Massachusetts Laborers' Annuity Fund is the lead plaintiff in this action.  Plaintiffs claim to have purchased shares of Tempur-Pedic stock during the Class Period, and to have suffered financial loss as a result of the federal securities laws violations alleged. (First Amended Complaint "FAC" ¶ 13).

#### B. The Defendants

#### 1. The Company

3

Tempur-Pedic is a company that engages in the manufacture, marketing, and distribution of advanced visco-elastic products under the TEMPUR and Tempur-Pedic brands. Its products include pillows, mattresses, and adjustable beds. (FAC ¶ 14).

### 2. The Individual Defendants

Plaintiffs bring suit against the following individuals: Robert B. Trussell, Jr. ("Trussell"), the Vice Chairman and former Chief Executive Officer of Tempur-Pedic; H. Thomas Bryant ("Bryant"), the current CEO and President of Tempur-Pedic; Dale E. Williams ("Williams"), President and Chief Financial Officer of Tempur-Pedic; Matthew D. Clift ("Clift"), Executive Vice President of Operations of Tempur-Pedic; Jeffrey S. Barber ("Barber") a Tempur-Pedic director and the Vice President of TA Associates; P. Andrews McLane, Chairman of Tempur-Pedic Board of Directors and a Senior Managing Director of TA Associates; David Montgomery ("Montgomery"), Executive Vice President and President of International Operations of Tempur-Pedic. *Id*. at ¶¶ 15-22.

### 3. TA Associates

TA Associates is a private equity fund that together with FF&L formed TWI Holdings to purchase Tempur-Pedic and subsequently bring Tempur-Pedic public in 2003. *Id*. at ¶ 23.

### 4. FF&L

FF&L is a private equity fund that together with TA Associates formed TWI Holdings to purchase Tempur-Pedic and subsequently bring

Tempur-Pedic public in 2003. *Id*. at ¶ 24.

## II. Substantive Allegations

## 1. False Statements and Omissions

The Complaint alleges that Tempur-Pedic's scheme began in early 2005. In January 2005, Tempur-Pedic announced a 6% price increase of all its mattress lines sold in the United States, effective February 1, 2005. Plaintiffs claim that this announcement caused a frenzy of retailers to stock up on their inventory needs before the price increase occurred. Plaintiffs allege that accelerated purchasing caused a huge amount of Tempur-Pedic's revenue to be pulled forward from the rest of the year because retailer demand decreased significantly in the second and third quarters of 2005. Plaintiffs claim that Defendants deliberately concealed the impact of the 6% price increase and led investors to believe that Tempur-Pedic could deliver sustained growth. *Id*. at ¶¶ 34-36.

During an April 21, 2005, conference call, when asked by Jonathan Shapiro of Goldman Sachs whether the price increase incentive resulted in Tempur-Pedic pulling forward revenues from future months, Defendant Williams stated: "We don't really believe there's a pull ahead." *Id*. at ¶ 48. On April 21, 2005, Tempur-Pedic issued a press release in which among other things, they reported record earnings and net sales in the first quarter of 2005. In the press release, CEO Trussell and President Bryant

5

stated that they felt Tempur-Pedic was solidifying its "worldwide leadership position" and that Tempur-Pedic could deliver "sustained growth." *Id*. at ¶ 47.   Through the release, Tempur-Pedic also increased the full-year guidance that it previously provided for 2005.   The updated guidance stated that "the Company now expects net sales for 2005 to range from $880 million - $890 million, rather than being in the vicinity of $880 million.   It currently expects pro forma diluted net income to range between $1.10 to $1.13 rather than being in the vicinity of $1.10." *Id*.

Plaintiffs allege that the truth at the time these statements were made, known by each of the Defendants, was that Tempur-Pedic's retail sales were in fact volatile and irregular and that this was a topic of presentations at Tempur-Pedic management meetings. *Id*. at ¶ 9(a).   Plaintiffs claim that to help advance their scheme to inflate the stock price, Defendants falsely boasted that Tempur-Pedic's competitors were not impacting its market share.   The Complaint alleges that Tempur-Pedic falsely led investors to believe that they would be launching a high-end mattress within the year.   On June 8, 2005, at a consumer conference in New York City, Defendants told the public that Tempur-Pedic was planning to launch a fifth mattress in late July at the inaugural Las Vegas furniture market, and that the mattress would be Tempur-Pedic's highest priced mattress yet. *Id*. at ¶ 40.   Plaintiffs claim that false positive representations such as these led analysts to have bullish

6

recommendations about Tempur-Pedic's stock, causing the stock to reach its highest price in history. *Id*. at ¶¶ 39,63,64.

The Complaint states that on July 21, 2005, after Defendants had already sold $246 million worth of Tempur-Pedic stock, Tempur-Pedic made two big announcements.  First, that instead of releasing its highest-end bed ever (as Defendants led the market to believe), Tempur-Pedic was re-releasing the low-end, OriginalBed.  The OriginalBed was priced much lower than Tempur-Pedic's other beds and was intended to compete with Tempur-Pedic's major competitors' beds. *Id*. at ¶ 42.  Second, that Tempur-Pedic's second quarter 2005 sales growth was much lower than expected. *Id.*  Plaintiffs allege that as a result of these disclosures, Tempur-Pedic stock dropped over 20% on July 22, 2005, as investors believed it was a sign that Tempur-Pedic had not been honest about its top-line growth and competitive pressure. *Id* at ¶¶ 42,75.

On July 21, 2005, Tempur-Pedic issued a press release regarding its second quarter 2005 financial results.  In the press release, CEO Trussell commented, "Tempur-Pedic International delivered excellent second quarter results and strong growth in what is seasonally a slower period for the retail furniture industry...By executing on our strategy, we believe Tempur-Pedic can deliver sustained growth and capitalize on the extraordinary market opportunity we have identified in the premium bedding category."  President Bryant continued, "we generated solid growth

in our established accounts and are well on track to meet our goal of increasing sales from these accounts by 30-35% this year." Tempur-Pedic went on to confirm the full year guidance that it had previously provided for 2005. *Id.* at ¶ 67. Plaintiffs claim that these statements were false when made because Tempur-Pedic was not on track to meet its goal of increasing sales in its retail channel by 30-35%, because much of the sales for the year were pulled forward into the first quarter of 2005. Furthermore, Plaintiffs claim that on July 21, 2005, there were additional signals that positive guidance was even more unattainable. *Id.* at ¶¶ 83(b),(f).

The Complaint alleges that the scheme continued, when, on August 11, 2005, in an effort to increase analyst confidence, Defendants reaffirmed Tempur-Pedic's 2005 guidance and told Citigroup that the factors that depressed second quarter growth would reverse in the third quarter. Plaintiffs allege that at the time the August 11, 2005, statement was made, Defendants knew there was a large variance between the actual and forecasted sales in the third quarter of 2005. Plaintiffs claim that Defendants knew about the discrepancy between the actual and forecasted sales because they were provided with reports detailing actual to forecasted sales on a monthly basis. Plaintiffs claim that, despite this knowledge, Defendants did nothing to lower Tempur-Pedic's guidance until September 19, 2005. *Id.* at ¶¶ 44-45.

On September 19, 2005, four weeks after re-affirming Tempur-

8

Pedic's guidance, the Defendants released Tempur-Pedic's 2005 third quarter financial results and lowered their 2005 guidance. The September 19, 2005, press release stated in part: "the Company currently expects net sales to range between $845 million and $855 million, compared to its previous guidance of approximately $880 million to $890 million. The Company currently expects pro-forma diluted earnings per share to be within the range of $1.05 to $1.07 and GAAP diluted earnings per share to be within the range of $1.04 to $1.06. This compares to its previous guidance of $1.10-$1.13 per share on a pro-forma basis and $1.08 to $1.11 per share on a GAAP basis. Pro forma earnings per share at this revised level for 2005 would represent an increase of 28% to 30% from 2004." *Id.* at ¶ 80.

The Complaint states that as a result of the lowered guidance and the truth being revealed about Tempur-Pedic's slow growth and competition in the industry, Tempur-Pedic stock fell 28% in one day, from $16.38 per share on September 19, 2005, to $11.70 on September 20, 2005. *Id.* ¶¶ 80-81.

### 2. GAAP violations

Plaintiffs allege that in order to improperly inflate Tempur-Pedic's net income, earnings, and revenue, Defendants caused Tempur-Pedic to falsely report its financial results included in press releases, analyst conference calls, and in Tempur-Pedic's Form 10-Q for the quarter ending on March 31, 2005. *Id.* at ¶ 85.

According to the Complaint, a former Tepur-Pedic sales representative claims that sales had decreased so significantly in the second quarter of 2005, that sales representatives company-wide were instructed not to process return credits during the last two weeks of the quarter, allowing Tempur-Pedic to falsely inflate its bottom line financial results. *Id*. at ¶ 93.

### 3. Insider Trading Allegations

Plaintiffs claim that a number of the defendants were motivated to engage in the fraudulent practices alleged herein in order to obtain insider trading proceeds. *Id.* at ¶ 27. Plaintiffs claim that these Defendants were corporate insiders who were in possession of material facts not disclosed to the public.

**(a) Montgomery**

During the Class Period, on April 26, 2005, Montgomery, Tempur-Pedic's Executive Vice President and President of International Operations, sold 30,000 shares of Tempur-Pedic stock at prices between $19.00-$19.15 per share for proceeds of approximately $572,000. *Id.* at ¶ 55.

Between May 2, and May 4, 2005, Montgomery sold 99,470 shares of Tempur-Pedic stock at prices between $19.25-19.95 per share for gross proceeds of $1.9 million. *Id.* at ¶ 57.

**(b) Barber**

During the Class Period, on May 4, 2005, Barber, a Tempur-Pedic director and the Vice President of TA Associates, sold 15,941

10

shares of Tempur-Pedic stock at $20.22 per share for gross proceeds of $322,327. *Id.* at ¶ 58.

On June 15, 2005, Barber sold 86,606 shares of Tempur-Pedic stock at $23.50 per share for gross proceeds of $2 million. *Id.* at ¶ 64.

**(c) Bryant**

During the Class Period, on May 4, 2005, Bryant, the current CEO and President of Tempur-Pedic, sold 69,293 shares of Tempur-Pedic stock at $20.00 per share for gross proceeds of approximately $1.38 million. *Id.* at ¶ 59.

**(d) Fogg**

During the Class Period between May 12, 2005, and May 16, 2005, Fogg, Senior Vice President of Tempur-Pedic and President of Tempur-Pedic's Retail division, sold 105,262 shares of Tempur-Pedic stock at prices between $20.17-$20.26 per share for gross proceeds of $2.1 million. *Id.* at ¶ 60.

**(e) FF&L**

On April 26, 2005, FF&L distributed 7 million shares of Tempur-Pedic stock to its partners. *Id.* at ¶ 56.

**(f) TA Associates**

On June 15, 2005, TA Associates sold 5,300,000 shares of Tempur-Pedic stock at $23.50 per share for gross proceeds of $124,550,000. *Id.* at ¶ 65.

**III. Motion to Dismiss Standard for Securities Fraud Complaints**

11

### A. Standard for Granting Rule 12(b)(6) Motion

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the plaintiff's complaint.  The Court views the complaint in the light most favorable to the plaintiff and "must accept as true 'well-pleaded facts' set forth in the complaint." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 680 (6th Cir. 2004) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).  "A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Weiner. v. Klais & Co.,* 108 F.3d 86, 88 (6th Cir.1997).  If it appears beyond doubt that the plaintiff's complaint does not state facts sufficient to "state a claim that is plausible on its face," then the claims must be dismissed.  *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1974 (2007); *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542(6th Cir. 2007); *Our Lady of Bellefonte Hospital, Inc. v. Tri-State Physicians Network, Inc.*, No. 06-141-HRW, 2007 WL 2903231, *2 (E.D.Ky. Sept. 27, 2007).

### B. Legal Standards

Plaintiffs' allegations of securities fraud arise under Sections 10(b) of the Securities Exchange Act (Security Act) and Rule 10b-5 promulgated thereunder.  Section 10(b) of the Securities Act prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the [SEC] may prescribe..." 15 U.S.C. § 78j(b).  Rule 10b-5 states: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

    (a)  To employ any device, scheme, or artifice to defraud,
    (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or
    (c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b-5.

Section 10(b) and Rule 10b-5 prohibit "'fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.'" *Miller v. Champion Enterprises, Inc.*, 346 F.3d 660, 661 (6th Cir. 2003)(quoting *Morse v. McWhorter*, 290 F.3d 795 (6th Cir. 2002)).  To establish a claim under Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5, a plaintiff must allege in connection with the purchase or sale of securities the following elements: (1) a misrepresentation or omission, (2) of a material fact, (3) made with scienter, (4) upon which the plaintiff justifiably relied, and (5) which proximately caused plaintiff's injury. 15 U.S.C. § 78j(b), *See also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001).  Control person and insider trading liability under Sections 20(a) and 20A is contingent upon the

13

plaintiff's ability to prove a primary violation under 10(b). *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696 (6th Cir. 2004). Dismissal of the control person claim and the insider trading claim is appropriate where the plaintiff does not establish the primary violation alleged. *Id.*

The pleadings will be reviewed under the heightened pleading standard for fraud claims prescribed by Fed.R.Civ.P 9(b), which requires the circumstances constituting fraud or mistake to be plead with particularity. In order to satisfy this heightened standard, a plaintiff must detail specifically the facts and circumstances it claims constitute the defendant's fraudulent conduct. *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999)(quotation omitted). In other words, the plaintiff must "allege the time, place, and content of the alleged misrepresentation," the fraudulent intent of the defendants and the resulting injury. *Id.* (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62(6th Cir. 1993)). Generalized and conclusory allegations that the defendant's conduct was fraudulent do not satisfy Rule 9(b). *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001)(quotations omitted).

The Plaintiffs' Complaint must also meet the heightened pleading standards of the PSLRA. In 1995, Congress enacted the PSLRA to prevent abusive litigation of the securities law by private parties. *Tellabs v. Makor Issues & Rights, Ltd.*, 127 S.Ct.

14

2499, 2509 (2007).  Under the PSLRA's heightened pleading requirements, a plaintiff now must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C § 78u-4(b)(1), (2)(emphasis added).  The PSLRA provides that if a plaintiff does not meet these requirements, a court shall, on any defendant's motion, dismiss the complaint. 15 U.S.C. § 78u-4(b)(3).

The Supreme Court has defined "scienter" as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  Thus, plaintiff must provide specific facts in support of the allegations of fraud, as well as provide support for allegations that the defendant acted with the required state of mind. *Helwig v Vencor, Inc*., 251 F.3d 540, 565 (6th Cir. 2001).  In securities fraud claims based on statements of present or historical fact, scienter can be established by knowledge or recklessness.[2] *PR Diamonds, Inc*., 364 F.3d at 682.  In securities fraud, recklessness is defined as "highly unreasonable conduct which is an extreme departure from the

_____

[2] Different scienter levels apply to forward-looking statements pursuant to the PSLRA's "safe harbor" provision. *Id.* at 681 n. 3. Defendants allege that numerous statements are protected by the PSLRA's "safe harbor" provision however the Court does not reach this issue because the Plaintiffs have failed to plead with the requisite scienter.

standards of ordinary care.  While the danger need not be known it must at least be so obvious that any reasonable man would have known of it." *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672)(6th Cir. 2003) *(*citing *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979)).  Recklessness is "a mental state apart from negligence and akin to conscious disregard." *In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 550 (6th Cir. 1999). Thus, the court must determine whether Plaintiffs have alleged facts sufficient to give rise to a strong inference that, when Defendants made the alleged misrepresentations or materially misleading omissions, they did so with at least a conscious disregard of the falsity of that information.

The Supreme Court recently clarified the process courts should use in determining whether a securities fraud complaint gives rise to a "strong inference" of scienter as required by the PSLRA. *Tellabs*, 127 S.Ct. at 2502-03.  The Supreme Court established three prescriptions for deciding Rule 12(b)(6) motions to dismiss a Section 10(b) action.  First, as with any Rule 12(b)(6) motion, courts must "accept all factual allegations in the complaint as true." *Id*. at 2502.  Second, "courts must consider the complaint in its entirety." *Id*.  The inquiry is whether all the facts alleged, taken collectively, give rise to a strong inference of scienter. *Id*.  Third, in deciding whether the pleaded facts meet the PSLRA's "strong inference" standard, courts "must take into account

16

plausible opposing inferences." *Id*. The Court then instructed the courts that after weighing competing inferences, "a complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id*. at 2502-03 (emphasis added).

## IV. Analysis

Defendants move the Court to dismiss Plaintiffs' Amended Complaint with prejudice, pursuant to the PSLRA and Federal Rules of Civil Procedure 9(b) and 12(b)(6) on several grounds. Here, Plaintiffs have failed to satisfy, as a matter of law, the requirements of the PSLRA. As stated above, under the PSLRA, Plaintiffs are required to state with particularity all facts giving rise to a "strong inference" of the required state of mind. *See* 15 U.S.C. § 78u-4(b)(1), (2). In order to create a strong inference of the required state of mind, Plaintiffs must state with particularity facts demonstrating that Defendants at least acted recklessly. Plaintiffs' Complaint does not raise a strong inference of recklessness.[3]

### A. Scienter

Plaintiffs argue that a holistic analysis of the Complaint

---

[3] It is not necessary for the Court to decide Defendants numerous other arguments on why dismissal is appropriate.

demonstrates that they have pled scienter by all Defendants. Specifically, Plaintiffs argue that the Complaint demonstrates a strong inference of scienter by the Defendants for a number of reasons: (1) Defendants' receipt of monthly financial reports, Defendants' positions in the company, and Defendants' Sarbanes-Oxley certifications, are evidence that Defendants were informed about the health of Tempur-Pedic's business; (2) Defendants later made admissions that the demand for its products during the Class Period was not as strong as they led investors to believe; (3) Tempur-Pedic was manipulating its bottom-line financial results by not allowing personnel to process returns; and (4) Defendants had the motive and opportunity to commit fraud as evidenced by the suspicious insider trading.  Plaintiffs' allegations are examined collectively to determine whether the totality of the specific facts alleged create a strong inference of scienter.  *P.R. Diamonds, Inc.*, 364 F.3d at 693 (citations omitted).

**1. Receipt of Monthly Reports and Positions in the Company**

Plaintiffs' allege that according to a former Tempur-Pedic distribution manager, reports detailing actual to forecasted sales were prepared by the various distribution managers and provided to defendants on a monthly basis.  These reports allegedly demonstrated that the Company was way behind its forecast when Defendants reiterated Tempur-Pedic's guidance in August 2005. (Complaint ¶ 45).  Plaintiffs, however, do not provide any of these

reports or cite any of their specific details.  Merely stating that the Defendants had access to and receipt of internal financial reports without any proof of the adverse content of those reports is not a basis for a strong inference of scienter. *Frank v. Dana Corp.*, 525 F.Supp. 2d 922, 929 (N.D. Ohio, 2007), *see also In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 985 (9th Cir. 1999)("We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability").  By failing to cite with specificity anything in any of the monthly financial reports that would have put Defendants on notice that there was a divergance between Tempur-Pedic's internal reports and external statements, Plaintiffs have failed to satisfy the PSLRA's pleading requirements.  The allegations of the internal reports are far too conclusory and do not support a strong inference of scienter.

Plaintiffs also point to the positions that certain individual Defendants held in the Company in support of their argument that Defendants were aware that Tempur-Pedic's financial status was not as rosy as they portrayed it to be.  While it is true that a few of the individual Defendants held high positions in the Company that is not enough to establish scienter.  *See Frank v. Dana Corp.,* 525 F.Supp.2d 922, 930 (N.D. Ohio, 2007)("Managerial position alone is not sufficient to establish scienter."), (*citing PR Diamonds, Inc.*

19

*v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004)).

Furthermore, alleging that Defendants were aware of Tempur-Pedic's financial situation as a result of Sarbanes-Oxley certifications is insufficient.  Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of financial statements. *Garfield v. NDC Health Corp*., 466 F.3d 1255, 1266 (11th Cir. 2006)(holding that such an inference was proper, "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.").  Besides claiming that Defendants received the previously discussed internal reports, Plaintiffs have failed to allege that any red flags existed whic would have placed the individual Defendants on notice that their Sarbanes-Oxley certifications were false.

## 2. Admissions and Representations Concerning the Release of a New High-End Mattress

While Plaintiffs contend that Tempur-Pedic admitted the demand for its product during the Class Period was not as strong as they had led investors to believe (Plaintiffs Opposition to Defendants Motion, 14), the Court can find no such disclosure by the Defendants.  In their September 19, 2005, press release, Tempur-Pedic did lower their 2005 guidance and say that they were experiencing a "slow down in growth." (FAC, ¶ 80).  However, this

20

is not an admission that demand for their product during the first and second quarters of 2005 was not as strong as they led investors to believe.

Plaintiffs also claim that Defendants' representation concerning Tempur-Pedic's new mattress release were false when they were made. Plaintiffs, however, do not point to any facts, documents, or other evidence that give rise to a strong inference that Defendants knowingly or recklessly misrepresented Tempur-Pedic's plans to release a new, higher priced mattress in the summer of 2005. A company's statement concerning its current business plan is not later rendered misleading when the company later decides to alter its strategic course. While Tempur-Pedic's release of a lower-priced mattress rather than a higher-priced mattress makes Tempur-Pedic's statements false, it does not, establish scienter - i.e., that Defendants knowingly or recklessly made false statements or were engaged in a scheme to defraud.

### 3. GAAP

In support of their argument that Defendants' acted with scienter, Plaintiffs claim that according to a former Tempur-Pedic sales representative, sales had decreased so significantly in the second quarter of 2005, that the sales representatives were told not to process return credits in the last two weeks of the second quarter of 2005. (FAC ¶ 43). This allegation fails to support a strong inference of scienter for a number of reasons.

21

First, looking at the competing inference which Defendants have presented leads the Court to believe that the failure to process returns would not have caused the financial reporting to be inaccurate. Defendants state in their memorandum in support of their motion to dismiss, that Tempur-Pedic does not report credits when products are returned, but rather, in accordance with GAAP principles, estimates returns at the time of the sale based on historical average return rates of 7%. (TPX Defendants' Motion to Dismiss, 45). Therefore, Defendants argue that Plaintiffs have failed to allege how a failure to timely process returns would affect reported earnings. Defendants' argument is well-taken and certainly lessens the scienter element of Plaintiffs' allegation.

Second, Plaintiffs' allegations regarding GAAP violations lack sufficient detail to support a strong inference of scienter. Though Plaintiffs claim sales representatives were instructed to not process returns, the Complaint fails to include information on: (a) who instructed the sales representatives to not process returns, (b) the amount of returns that were not processed as a result of the instruction, or (c) the specific amount of any alleged inaccuracy in Tempur-Pedic's financial results. *See Greebel v. FTP Software*, *Inc.*, 194 F.3d 185, 203-04 (1st Cir. 1999). Without more specific facts to support their allegation, the GAAP violation does not support a strong inference of scienter.

Finally, the Court puts some weight into the fact that the

22

GAAP violation claim is based on an anonymous source. *Dennis Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 757 (7th Cir. 2007)("It is hard to see how information from anonymous sources could be deemed "compelling" or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."). While the Court finds that confidential sources do not always lack relevance, the Court does discount the anonymous GAAP allegation in this case to some extent.

### 4. Insider Trading

Plaintiffs attempt to bolster scienter with allegations that Defendants engaged in insider trading. Courts have held that "insider trading at suspicious time or in an unusual amount" comprises one of the 'fixed constellations of facts that courts have found probative of securities fraud.' *In re Cardinal Health Inc. Sec. Litig.,* 426 F.Supp.2d 688, 727 (S.D. Ohio 2006)(citing *Helwig v. Vencor, Inc.* 251 F.3d 540, 552 (6th Cir. 2001). In the Sixth Circuit, trading by insiders may give rise to an inference of scienter if the trading is "suspicious." *See In re Ferro Corp. Secs. Litig*, Nos. 1:04CV1440, 2007 WL 1691358, at *14 (N.D. Ohio June 11, 2007). Plaintiffs have the burden at the pleading stage of explaining why the stock sales were unusual or suspicious. *See In re K-Tel Int'l, Inc. Sec. Litig.*, 300 f.3d 881, 896 (8th Cir. 2002). The mere sale of stock is not enough to lead the Court to

23

infer scienter. *See Ferro*, 2007 WL 1691358, at *14(*citing In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3rd Cir. 1999)).

In this case, Plaintiffs have failed to allege sufficient facts to show that Defendants' trading was unusual or suspicious. Plaintiffs' Complaint provides the Court with the names of the insiders who sold stock, the quantities of stock sold, the prices at which the sales occurred, and the dates of the sales, but nothing more. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1423 (3d Cir. 1997)(holding that a complaint that does not include critical contextual data is not enough to support the necessary strong inference of scienter).  Although there is no "bright line" test to determine whether a defendant's sale of his or her stock is "suspicious," courts routinely analyze the sale of stock by applying the following three factors: (1) whether the alleged trades were "normal or routine" for that particular insider; (2) whether the profits reaped were substantial enough in relation to the insider's compensation level so as to produce a suspicion that the insider might have had an incentive to commit fraud; and (3) whether in light of the insider's total stock holdings, the sales were unusual or suspicious. *See Ferro,* 2007 WL 16911358, at *14 (N.D. Ohio, June 11, 2007).  Plaintiffs' allegations do not include any of this type of information.  The FAC does not contain any information on Defendants' prior history, total compensation, or sales in relation to total holdings.

24

Without this information, it would be difficult to conclude that Defendants' sales of stock were suspicious.

Despite Plaintiffs' Complaint lacking critical contextual date, the individual Defendants, have provided some of the public records detailing individual Defendants' stock sales.[4]  In looking at the records,[5] several factors weigh against finding a strong inference of scienter.  First, three of the eight individual Defendants sold no stock at all during the Class Period. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3rd Cir. 1999)(finding no inference of scienter where three of the five individual defendants sold no stock during the Class Period and those who sold only a small percentage of their stock).  Two of the individuals who did not sell stock are Tempur-Pedic's Chief Executive Officer, Robert B. Trussell, Jr., and Chief Financial Officer, Dale, E. Williams.   Defendants Trussell and Williams

---

[4] This Court may take judicial notice of this critical information.  *See Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-361 (6th Cir. 2001)("this Court may consider the full text of the SEC filings, prospectus, analysts' reports and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment.")(citation omitted).

[5] Defendants have provided the Court with the relevant SEC filings along with a summary of Individual Defendants' trading activity.  The summary includes the percentage of stock holdings retained by the Individual Defendants, as well as their trading history for the two years prior to the start of the Class Period. After reviewing the information provided by Defendants the Court finds that the summary is an accurate reflection of the SEC filings.

collectively held 2,754,249 shares of Tempur-Pedic stock and exercisable options as of the end of the proposed Class Period. Defendant Trussell's holdings declined by almost $32 million from the time of the Class Period high of $24.50 on June 13, 2005, to $12.80 on September 20, 2005, the day following the close of the Class Period. The value of Defendant Williams' holdings declined by almost $2 million during that same period. Furthermore, in previous years Defendants Trussell and Williams sold large amounts of stock. In 2003, and 2004, Defendant Trussell sold over one million shares of Tempur-Pedic stock and Defendant Williams sold over seventy-four thousand shares of stock. The fact that the CEO and CFO sold no stock during the purported fraud and suffered large losses as a result, undermines the inference of scienter.

Second, the individual Defendants in this case collectively retained almost 93% of their holdings in Tempur-Pedic stock and exercisable options during the Class Period. Excluding the three individual Defendants who did not sell stock during the Class Period, the five individual defendants selling stock during the period collectively retained 80% of their total holdings. By retaining these shares and options, the individual Defendants' holdings declined by over $51 million from the Class Period high to the day following the close of the Class Period.

Third, evidence shows that sales by some of the individual Defendants during the Class Period were either lower or consistent

with their prior stock sale history.   For instance, Defendant Bryant sold 167,177 shares in 2004, in comparison to 69,293 shares during the Class Period and 125,074 total in 2005.  Defendant Fogg sold 316,413 shares in 2004, compared to 105,262 during the Class Period.   This evidence in conjunction with all the other information containing the sale of stock refutes the idea that Defendants' sale of stock was suspicious.

Fourth, Plaintiffs rely upon the fact that the timing of the insider trading was suspicious, as it was book-ended between the release of spectacular (but false) news in April 2005 and the first disclosure of bad news in June 2005.   However, none of the Defendants sold any stock between June 15, 2005, and September 19, 2005, when Tempur-Pedic revised its guidance.  Most of the sales by the individual Defendants were made in April and May of 2005, four to five months prior to the Company's revised guidance announcement.   The longer the time between stock sales and the disclosure of bad news, the more scienter is negated. *In re Party City Sec. Litig.*, 147 F.Supp.2d 282, 306 (D.N.J. 2001).

The contextual information provided by Defendants refutes a finding that the stock sales were suspicious.   Therefore, the Complaint does not draw a strong inference of scienter based on the allegation of stock sales.

### 6. Evaluation of All Factors

This Court must evaluate all of these factors together and

27

ask, "would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs,* 127 S.Ct. at 2511. Plaintiffs' assertions concerning the monthly reports that informed Defendants received are too conclusory. Plaintiffs cite no specific details of what was in these reports or how the reports conflicted with external reports on Tempur-Pedic's financial condition. Furthermore, Plaintiffs' allegations regarding violations of GAAP and insider trading are not enough to be considered a strong inference of scienter. An assessment of all the factors leads this Court to find that Plaintiffs have failed to meet the scienter requirement of the PSLRA.

### C. Complaint Against TA Associates and FF&L

Just as the allegations made by Plaintiffs regarding individual Defendants fail to meet the scienter requirements of the PSLRA, they likewise do not suffice for TA Associates and FF&L.[6]

---

[6] Defendants TA Associates and FF&L also argue that they cannot be held liable under §10(b) because they are not alleged to have made any statements or omissions. The Supreme Court recently held in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,* that reliance by the plaintiffs on defendants deceptive act is an essential element to a §10(b) private cause of action.128 S.Ct. 761, 769 (Jan. 15, 2008). The Court held that a presumption of reliance can be shown in two ways: First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement. *Id.* Defendants argue that they did not have a duty to disclose as they were merely stockholders. TA Associates and FF&L were connected to Tempur-Pedic by more than ownership of stock. Both TA Associates and FF&L were controlled by

28

Plaintiffs claim that TA Associates and FF&L were privy to material, non-public information by virtue of the fact that some of the controlling officers in their companies were also directors of Tempur-Pedic.[7] As stated above, Plaintiffs have failed to allege any specific facts showing that any defendants knew that any of the challenged statements were false when made. The only information that Plaintiffs plead in regard to TA Associates and FF&L which is distinct from Plaintiffs allegations against the Individual Defendants, is evidence of TA Associates and FF&L's stock sales. As previously discussed, the Plaintiffs have failed to include the relevant information necessary to put the stock sales into context and show that they were suspicious. However, in looking at information provided to the court by TA Associates and FF&L it is apparent that neither companies' sales were unusual or suspicious.[8]

individuals holding insider positions in Tempur-Pedic. Because Plaintiffs have failed to plead with the requisite scienter, this Court does not decide whether or not TA Associates and FF&L had a duty to disclose based on the fact that they were controlled by Tempur-Pedic insiders.

[7] Specifically TA's Senior Managing Director is McLane who is also Chairman of the Board of Tempur-Pedic; TA's Vice President is Defendant Barber who is also a director of Tempur-Pedic; FF&L's Managing Director is Masto who is a Tempur-Pedic director as well; and FF&L's President and Chief Executive Officer is Friedman, a Tempur-Pedic director during the Class Period.

[8] TA Associates provided the Court with their Form 4 Statements of Changes in Beneficial Ownership of Securities from 2003-2005. They also provided the Court with a summary of their relevant stock sales. After reviewing the Form 4's the Court finds that the summary adequately represents TA Associates stock sales. The Court will reference the summary for convenience purposes.

For instance, TA Associates sold 5,407,000 shares during the Class Period. (TA Appendix, Exhibit 1).  TA retained a total of 21,395,851 shares; therefore, the percentage of holdings sold during the Class Period consisted of only a fraction of TA Associates' total Tempur-Pedic stock (roughly 20%). *Id.*  When translated into dollar amounts, the shares that TA Associates retained declined in value by over $261 million during the Class Period. *Id.* In addition, TA Associates trading was not unusual when considered with the two years prior to the Class Period.  In 2003, TA Associates sold approximately $124 million in Tempur-Pedic shares, and in 2004, they sold over $158 million. *Id.*

As to FF&L, their prior trading history undermines any inference of scienter.  For instance, in 2003 FF&L distributed 4,657,302 shares, in 2004 FF&L sold 4,084,445 shares, and in 2005 prior to the Class Period FF&L distributed 4,000,000 shares. (FFL's Form-4 filings, attached to FF&L's Motion to Dismiss as Exhibit 1). Thus, while the distribution of seven million shares initially appears to be a large amount, in the context of FF&L's prior sales and distributions, seven million is not an unusual amount.

In sum, Plaintiffs have failed to allege any specific facts giving rise to a strong inference of scienter in regards to Defendants TA Associates and FF&L.

### D. Section 20(a) "Control Person" Liability Claims

Plaintiffs also seek to hold all Defendants, with the

exception of TA Associates and FF&L, liable as "controlling persons" of Tempur-Pedic under § 20(a) of the Exchange Act. However, in order to be liable under control person liability, the "controlled person" must have committed an underlying violation of securities law. *PR Diamonds, Inc.,* 364 F.3d at 696.  Thus, because Plaintiffs fail to state a claim for securities fraud under Section 10(b) and Rule 10b-5, their § 20(a) claim fails as well. *Id.*

### E. Section 20A "Insider Trading" Claims

Plaintiffs also allege that in selling shares of Tempur-Pedic stock, while in the possession of adverse, material, non-public information, Defendants Bryant, Barber, Fogg, Montgomery, McLane, TA Associates and FF&L violated §20A of the 1934 Securities Exchange Act and are liable to Plaintiffs for the substantial damages they suffered in connection with their purchase of Tempur-Pedic securities during the Class Period.  Section 20A(a) of the Exchange Act states that:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable...to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased...or sold...securities of the same class.

15 U.S.C. § 78t-1(a).

By its express terms, liability under Section 20A may only apply to a person who has committed a predicate violation under one

31

of the provisions of the Exchange Act or the rules promulgated thereunder. *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1130 (W.D. Mich. 1996). Because all of the Defendants § 10(b) and Rule 10b-5 claims were dismissed, the § 20A claim must be dismissed as well.

## V. Leave to Amend

At the end of their Opposition to Defendants' Motion to Dismiss, Plaintiffs request leave to amend their complaint. When a motion to dismiss is granted in a case not involving the PSLRA, the usual practice is to grant plaintiffs leave to amend the complaint. *See PR Diamonds*, 364 F.3d at 698 (6th Cir. 2004); *see also* Fed.R.Civ.P. 15(a)(leave to amend "should be freely given when justice so requires"). However, the Supreme Court has instructed that leave to amend is properly denied where there is "undue delay, bad faith or dilatory motive on the part of movant, repeated failure failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Miller,* 346 F.3d at 690(quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)). Plaintiffs motion to amend is denied on two grounds.

First, Plaintiffs have failed to follow the proper procedure for requesting leave to amend. They did not file a motion to amend along with an accompanying brief, as required by the local rules

32

governing practice before the district court.  Instead, they simply included the following request in their brief opposing the Defendants' motions to dismiss: "Should the Court be inclined to dismiss any claim or claims against any of the defendants, plaintiffs hereby respectfully request leave to amend the FACC, technically amended just one time, to correct any deficiencies or infirmities therein."  The Sixth Circuit has held that such bare requests in lieu of a properly filed motion are insufficient. *See PR Diamonds*, 364 F.3d at 699 (6th Cir. 2004).

Furthermore, the Sixth Circuit has interpreted the PSLRA as "restricting the ability of plaintiffs to amend their complaint, thus as limiting the scope of Rule 15(a) of the Federal Rules of Civil Procedure." *Miller*, 346 F.3d at 692("The purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA.").  Courts have limited the availability of amendments in securities fraud actions due to the PSLRA's purpose of screening out lawsuits having no factual basis.  *PR Diamonds*, 364 F.3d at 699-700; *Miller*, 346 F.3d at 691-92.  Plaintiffs in this case have had a number of chances to amend their pleadings.

### VI. CONCLUSION

Accordingly, and for the foregoing reasons,

**IT IS ORDERED** that: (1) Defendants' motions to dismiss [Record Nos. 72, 73, 75] be, and the same hereby are, **GRANTED.**

33

This the 28th day of March, 2008.



Signed By:

**_Joseph M. Hood_**

**Senior U.S. District Judge**